ARTHUR W. BINGHAM, EXECUTOR OF THE WILL OF CAROLINE MATHER JACKSON, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20303.   Promulgated March 21, 1929.

*Lee McCanliss, Esq.*, and *Walter D. Fletcher, Esq.*, for the petitioner.

*Brice Toole, Esq.*, for the respondent.

1002

1004

OPINION.

MILLIKEN: This proceeding involves the construction and application of section 403 of the Revenue Act of 1921. The pertinent parts of that section read:

(a) In the case of a resident, by deducting from the value of the gross estate—

(1) Such amounts for funeral expenses, administration expenses, claims against the estate, unpaid mortgages upon, or any indebtedness in respect to, property * * * as are allowed by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered, but not including any income taxes upon income received after the death of the decedent, or any estate, succession, legacy, or inheritance taxes;

(2) An amount equal to the value of any property forming a part of the gross estate situated in the United States of any person who died within five years prior to the death of the decedent where such property can be identified as having been received by the decedent from such prior decedent by gift, bequest, devise, or inheritance, or which can be identified as having been acquired in exchange for property so received: *Provided*, That this deduction shall be allowed only where an estate tax under this or any prior Act of Congress was paid by or on behalf of the estate of such prior decedent, and only in the amount of the value placed by the Commissioner on such property in determining the value of the gross estate of such prior decedent, and only to the extent that the

value of such property is included in the decedent's gross estate and not deducted under paragraphs (1) or (3) of subdivision (a) of this section. This deduction shall be made in case of the estates of all decedents who have died since September 8, 1916;

(3) The amount of all bequests, legacies, devises, or transfers * * * to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder, or individual, or to a trustee or trustees exclusively for such religious, charitable, scientific, literary, or educational purposes. This deduction shall be made in case of the estates of all decedents who have died since December 31, 1917; * * *

We have not been favored with a brief in behalf of respondent and therefore do not know whether he still insists that the term " in exchange " is limited to one exchange. In view of the decisions of the Board in *Elmer E. Rodenbough*, 1 B. T. A. 477, and in numerous other cases and of the decision of the Circuit Court of Appeals for the Third Circuit in *Rodenbough* v. *United States*, 25 Fed. (2d) 13, this question must be resolved adversely to respondent.

Petitioner, in a brief filed in his behalf, asserts that he has sufficiently identified the securities on hand at the date of death of the decedent which she acquired in exchange for securities received from her prior decedent, when he has shown that the proceeds of the sale of the original securities were deposited in a bank account and there commingled with other funds and the new securities were purchased with a check on said account and where at no time between the sale and purchase was the balance in bank less than the amount of the proceeds of the sale of the first securities. In support of this contention his counsel cites the following decisions of the Board: *Elmer E. Rodenbough, Executor, supra; John F. Archbold, Executor*, 8 B. T. A. 919; *John D. Ankeny, Executor*, 9 B. T. A. 1302; *Northern Trust Co., Executor*, 9 B. T. A. 1310; and *Rodenbough* v. *United States, supra*. In view of the conclusions which we have reached, it is unnecessary to review these decisions.

A peculiar situation is presented in this proceeding. Petitioner has introduced evidence in support of two or three allegations which are admitted by respondent's answer. The question of the effect of this evidence is not discussed in the brief filed in behalf of the petitioner. Our investigation of the authorities discloses that while one who admits an allegation of his adversary is prohibited from introducing evidence in conflict with his admission (31 Cyc. 676–677), one can not by admission deprive his adversary of the right to introduce evidence to prove a fact alleged by him, for the reason that if such rule prevails it would result in presenting to the jury a cold

fact instead of the colored painting which the evidence would disclose. See *Dunning* v. *Maine Central R. R. Co.*, 91 Me. 87; 39 A. 352; *Hambleton* v. *U. Aja Granite Co.*, 95 Vt. 295; 115 A. 102; *Terre Haute Electric Co.* v. *Kieley*, 35 Ind. App. 180; 72 N. E. 658; *Whiteside* v. *Loney*, 171 Mass. 431; 50 N. E. 931; *In re Masons Will*, 82 Vt. 160; 72 A. 329. These cases also lay down the rule that the admission or rejection of testimony under these circumstances lies within sound discretion of the court. Here the testimony was taken by depositions, the depositions were filed by petitioner at the hearing and no objection or exception whatever was made or taken by respondent. Under these circumstances we see no reason for us to raise any question as to the competency of the testimony. We have been unable to find any case where the testimony has in any way conflicted with the facts alleged and admitted. We believe that the true rule is that, where the facts proved do not contradict but fall within the facts alleged and admitted, we should accept the composite picture resulting from the combination of both; but where the facts proved conflict with the facts alleged and admitted, we should accept the evidence as controlling. We have applied this rule in making our findings of fact.

The facts which appear in item (2) of our findings of fact clearly demonstrate that the proceeds from the sale of the securities received by decedent from the estate of the prior decedent remained in the hands of decedent's brokers, Benedict Drysdale & Co., and were invested by them in new securities. The securities so purchased remained in the possession of decedent until her death and were included by respondent in her gross estate.

An analysis of the account rendered to decedent by her brokers, Jones, Montgomery & Auchincloss, relative to the sale and purchase of the securities set forth in item (3) of our findings of fact, shows that these were in fact " wash " sales. The sales and purchases were made on the same day and precisely the same stocks were sold and repurchased at precisely the same prices. The proceeds of the stocks received by decedent are easily traceable into the stocks which decedent owned at the time of her death. It, however, appears that the new stocks cost decedent in brokerage $321 and transfer taxes $36, or a total of $357, which it appears was paid by decedent out of funds other than those arising from the sale of the securities which she received from the estate of prior decedent.

With reference to the sales of the securities and the purchase of 500 shares of second preferred stock of Boorum & Pease Co., set forth in item (4) of our findings of fact, petitioner made the following allegations in his petition:

10. As set forth under B–III of Schedule G of the Federal Estate Tax Return, the decedent received from the estate of her husband the following securities:

300 shares Chicago, Milwaukee & St. Paul, Pfd.
400 shares Pennsylvania Railroad.
100 shares Chicago and Northwestern.
Total_____ $51, 487. 50

On December 18, 1921, Callaway, Fish and Co., the decedent's brokers, sold the shares of stock enumerated above for her. On January 9, 1922, the decedent took the proceeds of the stock, sold through Callaway, Fish & Co., and purchased the following:

500 Shares Boorum & Pease Co., 2nd Pfd. at 95. New York
Corporation Market price at date of death_____ $47, 500. 00
Dividends payable January, April, July, October 1.

The above allegations were admitted by respondent in his answer. Notwithstanding the above admission, petitioner introduced evidence to sustain the allegations. This evidence discloses that on December 29, 1921, decedent, through her brokers, Callaway, Fish & Co., sold the shares of stock received by her from the estate of former decedent and in addition thereto, 100 shares of Pennsylvania R. R. stock which she did not so acquire, and received from Callaway, Fish & Co. the total amount of $32,287.50. Deducting from this amount sale price of the 100 shares of Pennsylvania R. R. stock, which decedent did not acquire from former decedent, leaves a balance of $28,987.50, which is the amount decedent received for the stock acquired from the estate of her prior decedent. She deposited the total sum of $32,287.50 in bank to her credit in an account in which it was mingled with money arising from sources other than the estate of prior decedent. She then drew her check for $49,000 upon this bank account payable to Boorum & Pease Co., and with the additional sum of $1,000 withdrawn from her open account with that company, she purchased the said 500 shares of stock and paid therefor the sum of $50,000. It further appears from the evidence that the balance in bank between the date of the sale of securities and the purchase of the Boorum & Pease Co. stock was never less than the amount received from the sale of the securities. Here we have a composite picture made up of the admission by respondent that the stock of Boorum & Pease Co. was purchased with the proceeds of stock received from prior decedent and evidence that these proceeds fell short of the necessary amount to purchase the Boorum & Pease stock by approximately the sum of $21,000. We are of opinion that under this state of case the admission remains good to the extent of the proceeds arising from the sale of the original stocks. Nor are we confined to these facts alone. The evidence further shows that the original stocks were sold on December 29, 1921, that decedent

did not have sufficient funds in bank to pay the whole amount due; that it was necessary to add to what she could withdraw from bank an additional amount of $1,000 from her open account with Boorum & Pease Co.; that she already owned over 1,300 shares of this stock, and that her new stock was dated back to January 1, 1922, in order that the dividends should run from that date. These facts strongly indicate that the original stocks were sold in order that their proceeds might be used to purchase the Boorum & Pease Co. stock. On all the facts we are of the opinion that petitioner has traced into the Boorum & Pease Co. second preferred stock, proceeds of stock acquired from the prior decedent to the extent of $28,987.50 par value of such stock.

We have found in item (5) of our findings of fact that the amount of $10,186.67 paid by decedent for the Duquesne Light bonds included the sum of $10,000 received by her in payment of the principal of the Bethlehem Steel bonds. Here again respondent admitted the allegations of the petition relative to said sale and purchase and here again petitioner introduced evidence. This evidence disclosed that the proceeds of the Bethlehem Steel bonds went into a general bank account and that decedent purchased the Duquesne Light bonds with a check drawn upon such bank account, but the same witness, who gave the above testimony and who was entirely conversant with the affairs of both decedent and prior decedent, testified on cross examination:

Q. Didn't you say, though, that the proceeds, which were in the form of a check, was deposited in her general account?

A. In her general account.

Q. I am not referring to that check—her check, which was sent to Lee Higginson & Company in payment of the new securities, Duquesne Light. Did that check indicate whether it was a payment made from the Bethlehem Steel bonds proceeds or from general funds derived from other sources?

A. I don't know just what you mean but it was the proceeds of the Bethlehem Steel bonds that paid for the Duquesne Light bonds.

Q. Why do you say that?

A. Because that money was to be reinvested and not used for anything else. She did not use that in her general expenses.

In view of this uncontradicted testimony, and irrespective of respondent's admission, it is clear that securities received by decedent from the prior decedent have been identified to the extent of $10,000 par value in the Duquesne Light bonds.

With respect to the purchase by decedent of premises 15 and 17 East 76th St., New York City, we have found in item (6) of our findings of fact that the amount of $49,000 was paid by decedent on the purchase price out of funds received from a debt due former decedent and out of insurance policies, both of which were included in and taxed as part of the estate of former decedent. With respect to these transactions, it is alleged in the petition—

12. As set forth under D–II of Schedule G of the Federal Estate Tax Return, the decedent received $25,595.88 from the estate of her husband, which was paid into his estate on insurance policies held by him at his death, and which were included in the taxable property under Schedule C of the said Estate Tax Return in his estate. Decedent also received a debt, which was due the estate of the prior decedent, consisting of a loan to Boorum & Pease Co., which was valued in the Federal Estate Tax Return of the prior decedent at $59,603.32. On July 30, 1919, the decedent purchased the premises at 15 and 17 East 76th Street, New York City, and $49,000 of the purchase price of said premises was paid by the decedent from the moneys received from the insurance policies and the obligation of the Boorum & Pease Co., as set out above.

Respondent's answer admits the above allegations. Petitioner introduced evidence to the effect that the proceeds of the debt were deposited in a general bank account from which the sum of $49,000 was withdrawn and used in making a part payment on the purchase price of the real estate. This evidence in no way conflicts with the admission that the proceeds of the debt to the extent of $49,000 were used in making such part payment. Both facts no doubt are true. We, therefore, hold that petitioner has traced money received by decedent from the estate of the prior decedent, to the extent of $49,000, into the real estate at 15 and 17 East 76th St.

The question now arises, to what extent, if any, should petitioner be allowed deductions in the above cases? Section 403 (a) (2) provides that this deduction may be allowed "only in the amount of the value placed by the Commissioner on such property in determining the value of the gross estate of such prior decedent, and only to the extent that the value of such property is included in decedent's gross estate and not deducted under paragraphs (1) and (3) of subdivision (a) of this section." With respect to the first limitation in the above provision, we said in *Fidelity Union Trust Co., Executor*, 6 B. T. A. 125:

* * * In other words, the value of such previously taxed property for the purpose of determining the deduction can not be greater than the amount at which it was included in the decedent's gross estate and can not be greater than the amount at which it was valued in determining the gross estate of the prior decedent, but should be as large as the lesser of the two amounts above mentioned.

Within the limits prescribed in section 403 (a) (2), it appears clear that Congress intended to give full effect to the deduction and thus avoid double taxation. At the same time it was the intent of Congress to prevent the exemption from estate tax of the value of property of a decedent which he did not receive from the estate of a former decedent who had died within five years and the transfer of whose estate had been taxed. Each of these intentions should be given full effect, and in so doing we see no reason why one piece of property acquired with both property received from a prior decedent and other

property may not be exempted in computing the net estate to the extent that property of the prior decedent is traced into it, subject of course to the other limitations of the section. It would not be contended, we think, that where a decedent had acquired a one-half interest in a piece of real estate with the proceeds of property received from the prior decedent, the value of such one-half interest would not be deductible. There is no valid reason why the same rule should not apply where the decedent acquired property with the proceeds of property received both from the former decedent and from other sources.

Applying the above rule to the Boorum & Pease Co. stock, we find that the securities received by decedent from prior decedent were valued in the estate of the latter at the sum of $51,487. These securities were sold for $28,987.50 and the proceeds, together with $21,012.50 received from other sources, were used to purchase the Boorum & Pease Co. stock. Therefore, the amount of this stock which is attributable to the estate of prior decedent is $\dfrac{2898750}{5000000}$ of 500 shares. Cf. *John F. Archbold, Executor, supra.* The Boorum & Pease Co. stock was valued to the estate of decedent at $47,500. Since the proportion of the latter amount attributable to the estate of the prior decedent is less than the value of the property received from former decedent, as of the date of his death, such proportional value of the Boorum & Pease Co. stock, is the amount of the deduction which should be allowed. This rule should also be applied to the facts appearing in items (3), (5) and (6) of our findings of fact. Under item (2) the amount of the deduction is the sum of $40,457.03, this being less than the value of the securities received from the prior decedent as included in his estate.

Respondent denied the deduction of executor's commission in the amount of $11,864 and attorney's fees in the amount of $25,000, on the ground that no part of either had been paid. Petitioner introduced testimony to the effect that the total executor's commissions amounted to $27,435.53, and the total disbursements for attorney's fees and disbursements amounted to $18,555.46. The gross estate of decedent was valued by respondent at $1,405,053.03, of which only $170,000 represented real estate. We have no doubt that the amounts proved represent reasonable and statutory allowances under the law of New York (cf. *Walter W. Voelbel, Executor,* 7 B. T. A. 276), and that the whole amount so proved would be deductible but for the fact that petitioner in his petition has limited himself by alleging error as to respondent's refusal to permit the deduction of executor's commission in the amount of $11,864 and attorney's fees in the amount of $17,500. We are of opinion that deductions for these items should

be allowed, but only in the amounts claimed in the petition, the amounts so claimed being less than the amounts proved.

Petitioner further asserts that respondent erred in determining that petitioner had failed to prove that no part of the property received by decedent from the prior decedent had been used to pay funeral expenses, debts of decedent, unpaid mortgages, and charitable bequests in the amount of $21,753.40. Petitioner proceeded to take proof on the question of from what sources this amount was paid. We believe this evidence irrelevant. In *Seaboard National Bank, Executor*, 11 B. T. A. 1386, we held that the provision in section 403 (a) (2) which prescribes that the deduction with respect to property received from a prior decedent is limited to amounts not deducted under paragraphs (1) or (3) of subdivision (a), was inserted by Congress for the purpose of preventing a double deduction; that a double deduction did not result when the estate of the decedent received from sources other than the prior decedent was greater in value than the deductions permitted by paragraphs (1) and (3); and that when the estate of decedent received from sources other than the prior decedent was in value in excess of the amount of the deductions under paragraphs (1) and (3), the whole of such deductions should be taken from such part of the estate, regardless of from what sources such items were paid.

Applying the above rule to this proceeding, we find that the net estate of decedent as determined by respondent amounts to $535,-312.30, and that, after deducting all the additional amounts allowed by us as representing property received from the estate of prior decedent, there still remains an amount largely in excess of the amounts sought to be deducted for executor's commission, attorney's fees, debts and unpaid mortgages. We are, therefore, of opinion that petitioner is entitled to deduct from the gross estate of decedent the amounts allowed by respondent as representing property acquired from the former decedent, plus the additional amounts allowed in this opinion and plus the following amounts: $21,753.40, representing debts of decedent and unpaid mortgages; $11,864, executor's commissions; and $17,500, attorney's fees.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

MURDOCK, dissenting: I dissent in part from the prevailing opinion. The Commissioner has allowed deductions for funeral and administration expenses and also for charitable, public and similar bequests and he further determined that these items should be deducted from that part of the estate of the decedent which she had acquired from the prior decedent, because there was no showing that the value of

property received from the prior decedent had not been deducted under paragraphs 1 and 3 of subdivision (a) of section 403 of the Revenue Act of 1921 to the extent of the deductions allowed under those paragraphs. In this he erred in part, since it appears that there were funds to pay the funeral and administration expenses without touching the property received from the prior decedent. But before allowing deductions for the full amount of all bequests to charities, etc., under paragraph 3, and at the same time allowing deductions under paragraph 2 of the full amount of the value of the property received from a prior decedent, we should know that property received from the prior decedent has not been specifically devised or bequeathed to charities and that it was not necessary to use property received from the prior decedent to pay or satisfy the bequests or devises to charities, etc. In the present case we do not know that the property received from the prior decedent has not been needed for these purposes.